Nena **MILLER**, Individually, Nena Miller as Personal Representative of the Estate of William Miller, Jr., Deceased, Nena Miller as Next Friend of Lindsay Y. Miller and Kristen Miller, Appellants,

v.

**CITY OF FORT WORTH,**
Texas, Appellee.

No. 2–93–196–CV.

Court of Appeals of Texas,
Fort Worth.

Dec. 27, 1994.

Rehearing Overruled Feb. 14, 1995.

28

Donald H. Flanary, Jr., D. Brad Dickinson, Robert B. Gilbreath, Vial, Hamilton, Koch & Knox, Dallas, Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, for appellants.

David E. Keltner, Wade H. McMullen, Karen S. Precella, Haynes and Boone, L.L.P., Wade Adkins, City Atty., Terry M. Vernon, Asst. City Atty., City of Fort Worth, Fort Worth, for appellee.

Before FARRIS, WEAVER and HICKS, JJ.

OPINION

WEAVER, Justice.

The City of Fort Worth (the "City") was sued for damages resulting from death caused by its alleged failure to install a traffic control device at a street intersection. The principal issues presented are whether a cause of action to recover such damages under the Texas Wrongful Death Act ("WDA")[1] is barred by the City's defense of governmental immunity, and whether the City, even if not liable under the WDA, is

---

1. Tex Civ.Prac. & Rem Code Ann. ch. 71 (Vernon 1986).

nevertheless liable for limited damages under the Texas Tort Claims Act ("TCA").[2]

Appellants (the "Millers") sued the City for damages resulting from the death of William Miller Jr., who died as a result of injuries received in an intersectional automobile collision on June 9, 1988. Appellants are his surviving wife and children.[3] They alleged that the negligence, gross negligence and intentional conduct of the City, in failing to provide a traffic control device at the intersection, proximately caused the injuries and damages which they sought to recover.

The jury found the negligence of the City proximately caused the occurrence in question, and awarded damages of $4,400,000.00 to the surviving wife and $300,000.00 to each of Miller's two surviving children, as well as $25,000.00 for pain and mental anguish suffered by Miller before his death as a result of the occurrence. The jury failed to find gross negligence on the part of the City and awarded no exemplary damages.

The trial court, after considering the City's *Motion for Judgment Notwithstanding the Verdict*, found that the Millers' cause of action under the WDA was barred by the City's defense of governmental immunity, that their recovery against the City was limited to the maximum amount of money damages allowable under the TCA, and that judgment should be rendered in favor of the Millers against the City in the amount of $250,000.00 for the death of William Miller, Jr. Judgment for that amount was then awarded against the City in favor of Nena Miller, Individually and as Personal Representative of the Estate of William Miller, Jr., Deceased, and as next friend of Lindsay Y. Miller and Kristen Miller, jointly.

The Millers bring four points of error, all of which concern their attack against the trial court's holding that their action under the Wrongful Death Act was barred by the City's defense of governmental immunity. The City by five cross-points attacks the action of the trial court in granting the $250,000.00

judgment to the Millers. We overrule the Millers' second point of error and do not reach their other points of error. We sustain the City's first cross-point, and accordingly reverse the judgment of the trial court and render judgment that the Millers take nothing against the City.

On the afternoon of June 9, 1988, William Miller, Jr. was driving his Chevrolet Suburban in a northbound direction on Bellaire Drive South. He was on his way home to meet his wife, Nena Miller. At that same time, Joel Trott was driving a Nissan automobile in an eastbound direction on Glen Meadow Drive. Johnny James and Brian Spain were passengers in the Nissan.

As the two vehicles approached the intersection of Bellaire Drive South and Glen Meadow Drive, Trott, who was driving at a high rate of speed, failed to yield to Miller's vehicle and the vehicles collided. Miller was pronounced dead at the hospital where he had been transported by helicopter. Johnny James was pronounced brain-dead the following day. Joel Trott sustained severe permanent brain damage. Only passenger Brian Spain escaped serious injury.

While the Millers initially alleged that the action was brought pursuant to the WDA, the TCA, and various provisions of the Texas and United States constitutions, their brief states that their claims against the City are premised on the WDA, and their arguments on this appeal primarily concern the trial court's failure to grant judgment to them under the WDA for the full amount of damages found by the jury. In the alternative, they request us to affirm the actions of the trial court in awarding judgment to them under the TCA.

### Recovery Under The Wrongful Death Act

We will first address the Millers' second point of error by which they attack the trial court's ruling that their cause of action against the City under the WDA was barred by the City's defense of governmental immu-

2.  TEX.CIV.PRAC. & REM.CODE ANN. ch. 101 (Vernon 1986).

3.  Miller's father, William Miller Sr., was a plaintiff in the lawsuit and also sought damages against the City. The judgment of the trial court awarded no recovery to the father. However, he did not perfect an appeal and is not a party to this appeal.

nity. They claim their cause of action was not barred and that they were entitled to judgment under the WDA for the full amount of damages found by the jury.

The Millers acknowledge that under the common law and under the laws of this State a city has a defense of sovereign or governmental immunity against claims for damages resulting from injuries to or from the death of a person unless such defense is waived by statute. They then claim that the WDA in and of itself waives sovereign immunity for municipal corporations, that under the plain language of that act cities have no sovereign immunity, and that by its terms the WDA imposes liability on the City in this case.

■ In support of the proposition that the WDA, by its own terms, waives sovereign immunity for the City under the facts of this case, the Millers refer us to various portions of that act, and specifically:

§ 71.001. Definitions

(1) "Corporation" means a municipal ... corporation.

(2) "Person" means ... corporation; and

§ 71.002. Cause of Action

(b) A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default.

TEX.CIV.PRAC. & REM.CODE ANN. §§ 71.001(1)(2), 71.002(b) (Vernon 1986).

Hence, the Millers argue that by including cities under the definition of "persons" under the WDA, the legislature by plain language waived sovereign immunity for cities in wrongful death cases, thus making cities liable for the wrongful death of those they negligently kill.

The Millers concede that attempts by litigants to recover damages for the death of their family members against municipal corporations, under the WDA as initially adopted, were defeated. *See Ritz v. City of Austin,* 1 Tex.Civ.App. 455, 20 S.W. 1029 (1892, writ ref'd). A further attempt to recover against a city under the WDA was also denied after the act was amended to include corporations, when it was held in *City of Dallas v. Halford,* 210 S.W. 725 (Tex.Civ. App.—Dallas 1919, writ ref'd), that the term "corporation" as included in the amendment simply meant private corporations. They then rely upon the language of the WDA, as further amended following *Halford* to include in essence the same language that it carries today, as constituting a statutory waiver of the City's defense of governmental immunity. In support of that proposition, the Millers rely upon several cases from the early part of this century. *See Pearce v. Hallum,* 30 S.W.2d 399 (Tex.Civ.App.—Dallas 1930, writ ref'd); *Trevino v. City of San Antonio,* 269 S.W. 1067 (Tex.Civ.App.—San Antonio 1925, writ ref'd); and *Slate v. City of Fort Worth,* 193 S.W. 1143 (Tex.Civ.App.—El Paso 1917, no writ).

However, they acknowledge a contrary holding in *Connally v. City of Waco,* 53 S.W.2d 313 (Tex.Civ.App.—Waco 1932, writ ref'd) (op. on reh'g) which they attempt to distinguish as erroneously relying on the distinction between governmental and proprietary functions. The City says that *Connally* is the controlling authority on this issue, and points out that the *Connally* court, when construing the relevant provisions of the WDA as a whole held that "it was the clear intention of the Legislature not to make municipal corporations liable for the acts of its employees when engaged in strictly governmental functions." *Id.* at 314. Thus, we do not find the cases cited by the Millers support their position. Additionally, governmental immunity can be waived only by clear and explicit legislative language. *See Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980). The WDA contains no clear and explicit language waiving governmental immunity. Thus, following *Connally,* we reject the Millers' contention that the WDA in and of itself waived governmental immunity and that they had a right to seek recovery against the City strictly on the basis of the language of that act.

■ The Millers then present other arguments as to why they were entitled to sue the City under the WDA. First, they contend that cities have no sovereign immunity

against wrongful death claims due to the effect of section 5.904 of the Local Government Code. That section reads:

(a) A municipality may not be considered a corporation under a state statute governing corporations unless the statute extends its application to a municipality by express use of the term "municipal corporation," "municipality," "city," "town," or "village."

(b) It is the intent of the legislature that the limitation provided by this section apply regardless of whether the municipality is acting in a governmental or proprietary function.

Tex.Loc. Gov't Code Ann. § 5.904(a)(b) (Vernon Supp.1994).

The Millers would apparently have us interpret section 5.904 as granting some additional rights to litigants to sue cities under the WDA, and as constituting a statutory waiver of any governmental immunity cities might have otherwise had with respect to claims brought under the WDA. Their claim is that since a city is liable for tortious conduct generally under the WDA for injuries resulting from its proprietary acts, its liability is extended to injuries resulting from its governmental functions by virtue of the language in section 5.904(b), which states "that the *limitation* provided by this section apply regardless of whether the municipality is acting in a governmental or proprietary function." *Id.* at § 5.904(b) (emphasis added). The only case cited by the Millers in support of their contention is *The City of El Paso v. Croom Constr. Co.*, 864 S.W.2d 153 (Tex.App.—El Paso 1993, writ denied), where attorney's fees were sought against a city in a declaratory judgment action. The court held that the declaratory judgment act waives immunity for municipalities in actions seeking declaratory judgment, and, because that act included municipalities within its terms, the court held that the "protections" of section 5.904 did not apply. *Id.* at 155. We do not consider that case as bearing on the issue here under review.

We view section 5.904 as a limiting statute, specifically providing that a municipality may not be considered a corporation under a statute unless the statute extends its application to the municipality by the use of express terms. Certainly, section 5.904 contains no clear and explicit language which would serve to waive the city's defense of governmental immunity. *See Duhart, supra.* We reject the Millers' claim that the language of section 5.904 had the effect of waiving the City's immunity against wrongful death claims.

Secondly, the Millers apparently claim that the City's immunity under the WDA was waived by section 5.904 when that section is considered in conjunction with the provisions of the TCA. They state that prior to the time the TCA was adopted cities could be held liable under the WDA for injuries resulting from a proprietary act and that the TCA had no effect on that right. They then state that the TCA made it possible to sue a city for injury and damages caused by its governmental functions, and apparently they claim that such right under the TCA, when coupled with the language of section 5.904(b), serves to waive the City's immunity under the WDA. Neither of those statutes contain language clearly and explicitly waiving such immunity, and the Millers cite no authority to support that proposition. Accordingly, that contention is rejected.

We find no error in the trial court's ruling that the Millers' cause of action against the City under the WDA was barred by governmental immunity. Point of error two is overruled.

Under points of error one, three and four, the Millers generally attack the actions of the trial court in limiting their recovery under the judgment to $250,000.00, the maximum amount recoverable under the TCA, and in not rendering judgment for $5,206,716.42, being the full amount of damages found by the jury. Since all of these points are dependent upon the Millers' claim that they were entitled to recover against the City under the WDA, and because we have rejected that claim in overruling point of error two, we need not address points of error one, three and four.

## RECOVERY UNDER THE TEXAS TORT CLAIMS ACT

As mentioned above, the Millers assert that their claims against the City are prem-

ised on the WDA. However, in the alternative, and since we have held their claims under the WDA are barred, they request us to affirm the $250,000.00 judgment granted to them under the TCA. With respect to that request, we must first address the City's cross-points.

■ In its first cross-point, the City claims the doctrine of governmental immunity completely bars any recovery by the Millers under the circumstances of this case, including any recovery under the TCA. As previously mentioned, a city has a defense of governmental immunity against claims of this nature unless such defense is waived by statute. Thus, when the TCA does not waive immunity for governmental functions, immunity remains the rule. *Josephine E. Abercrombie Interests, Inc. v. City of Houston,* 830 S.W.2d 305, 308 (Tex.App.—Corpus Christi 1992, writ denied).

Section 101.0215(a) of the TCA provides that a municipality is liable under the act for damages arising from its governmental functions,[4] which are described as those enjoined on a municipality by law and are given it by the state, to be exercised by the municipality in the interest of the general public. Listed, as being included in such functions are warning signals; regulation of traffic; and maintenance of traffic signals, signs and hazards.[5]

The City contends that while a municipality may be generally liable under section 101.0215(a) for claims arising from a governmental function, such as the regulation of traffic, immunity is not waived, and accordingly the municipality is not liable, if the performance of a listed function falls within at least one of two statutory exceptions otherwise provided by the TCA. The City claims such exceptions specifically preserve governmental immunity regarding the performance of the functions listed in section 101.0215(a). The City claims sections 101.056 and 101.060(a)(1) and (2) of the act provide those exceptions.

■ We first address the City's claim that its governmental immunity was preserved under section 101.056, which provides that the TCA does not apply to a claim based on:

(1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or

(2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.056 (Vernon 1986).

■ The placement of stop signs, a governmental function under section 101.0215(a), is discretionary in nature, and the City is immune to liability for negligence in the placement of signs under section 101.056. *See Shives v. State,* 743 S.W.2d 714 (Tex. App.—El Paso 1987, writ denied). Although *Shives* interprets the *former* TCA,[6] the language in the relevant provisions of the former act is the same as that of section 101.056.

The City does not dispute the Millers' claim that it did not place a stop sign at the intersection of Bellaire Drive South and Glen Meadow Drive prior to the fatal collision at that intersection on June 9, 1988; however, the record contains no evidence showing that the City made a decision to place a stop sign at that intersection prior to the collision. Accordingly, we find that the City's failure to install a stop sign and/or its failure to make a decision to do so falls within its discretionary powers, and that the City was thus exempt from liability for failing to install the stop

---

4. The TCA provides that it is not applicable to the liability of a municipality for damages arising from its proprietary functions, being those functions that a municipality may, in its discretion, perform in the interest of its inhabitants, but not including the listed governmental activities. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 101.0215(b), (c) (Vernon Supp.1994).

5. Other portions of the TCA provide for potential liability of a governmental unit under certain situations which are not pertinent to the present case. *See* TEX CIV.PRAC & REM.CODE ANN §§ 101.021, 101.022 (Vernon Supp.1994).

6. TEX.REV.CIV STAT ANN. art. 6252–19, § 14(7) (Vernon 1970) (repealed 1985) (current version at TEX CIV.PRAC & REM.CODE ANN. § 101.056 (Vernon 1986)).

sign, under section 101.056, subject, however, to the provisions of section 101.060(a)(1) and (2).

▊ Section 101.060(a) provides that the TCA does not apply to a claim arising from:

(1) the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit;

(2) the absence, condition, or malfunction of a traffic or road sign, signal, or warning device unless the absence, condition, or malfunction is not corrected by the responsible governmental unit within a reasonable time after notice.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.060(a)(1)(2) (Vernon 1986).

Accordingly, we now turn our review to the question of whether the City had notice that a dangerous condition existed at the intersection where the collision occurred so as to bring it within the purview of section 101.060, and by which it could become subject to liability if it failed to correct the condition regarding the absence of a stop sign within a reasonable time after it received such notice.

In cases where the issue has been one of whether a governmental body had notice of the absence of a traffic signal or the dangerousness of an intersection, the inquiry has generally been whether the governmental body had *particular* notice of a *particular* problem. In *Garza v. State*, 878 S.W.2d 671, 675 (Tex.App.—Corpus Christi 1994, n.w.h.), the issue involved the posting of an appropriate speed limit at an intersection near a school. In *Zambory v. City of Dallas*, 838 S.W.2d 580, 582 (Tex.App.—Dallas 1992, writ denied), the city council was asked for, and decided to install, a traffic signal where a bicycle trail crossed Greenville Avenue, in Dallas. In *State v. Norris*, 550 S.W.2d 386, 391 (Tex.Civ.App.—Corpus Christi 1977, writ ref. n.r.e.), the fact that engineers had been told about a signal malfunction at an intersection gave rise to a claim against the city. In *Sparkman v. Maxwell*, 519 S.W.2d 852, 858 (Tex.1975), police notified the traffic engineer of a problem with a specific signal, and after another officer spotted a near-collision, engineers were again informed of the problem. We do not find a case where *notice* to a governmental body of a problem in a general area is sufficient to give notice about the same problem in an adjacent area.

The City and the Millers rely generally on the same evidence to advance their respective arguments on the question of notice. The City contends that concerns regarding traffic safety as communicated by various residents to the City over a period of some two years represented only concerns respecting a neighborhood or subdivision which *did not* include the intersection where the accident occurred and thus did not put the City on notice of any dangerous conditions regarding that intersection. The Millers counter that the City had knowledge and notice of a problem along Bellaire Drive South and describe as "glib and hypertechnical" the City's distinction between two adjacent subdivisions regarding the notice issue.

Bellaire Drive South runs in a roughly north-south direction through the center of two separate but abutting subdivisions. The northern one is the Meadows West Subdivision. The southern one, being the one in which the intersection of Bellaire Drive South and Glen Meadow Drive is located, is the Bellaire Park North Subdivision. The boundary between the two subdivisions runs in an east-west direction and crosses Bellaire Drive South one block south of Meadows West Drive, which is in the Meadows West Subdivision. The point where the subdivision line crosses Bellaire Drive South is also one block north of Trinity Landing Drive and two blocks north of Glen Meadow Drive, the latter two streets being in the Bellaire Park North Subdivision.

Whit Smith, a resident of the Meadows West Subdivision, and president of the Homeowners Association for that subdivision, testified that the Bellaire Park North Subdivision was a neighborhood distinct from Meadows West, and that he did not know whether the Bellaire Park North Subdivision was ever included in the Meadows West Homeowners Association.

On July 12, 1985, the City approved a final plat for the Bellaire Park North Subdivision,

**34**

which showed the streets Trinity Landing Drive, Green Meadow Drive and Savannah Lane intersecting Bellaire Drive South. On September 13, 1985, the City accepted a corrected plat of that subdivision, which illustrated the same subdivision boundaries but which changed the name of "Green Meadow Drive" to "Glen Meadow Drive."

Whit Smith was elected president of the Meadows West Homeowners Association at a meeting of the association held on October 21, 1985. Fort Worth City Manager Doug Harmon spoke at that meeting and was joined by his assistant, Libby Lanzara, and Denise Prado, a sector planner for the City. Among the topics the three discussed at the meeting were zoning, neighborhood growth and the installation of stop signs. The association held another meeting on November 6, 1985, at which Whit Smith volunteered to contact Libby Lanzara, with the City, about traffic on Bellaire Drive South and the possible installation of stop signs *in the neighborhood.*

On November 26, 1985, Whit Smith wrote Libby Lanzara at the City's "Action Center," and expressed an interest in "pursuing the placement of traffic signs *within Meadows West.*" He expressed a specific interest in "stop signs on all major street corners and especially those that intersect with Bellaire Drive South." Smith thanked Lanzara on behalf of the *Meadows West Homeowners Association* and asked that his letter be referred to the appropriate person.

An "Action Center" memo dated December 4, 1985, instructed Walt Cooper, with the City's Transportation and Public Works Department, to inspect *"the Meadows West Drive area."* The memo was prepared after the Action Center had received a request for an inspection from Whit Smith, and was accompanied by a copy of Smith's November 26, 1985 letter to Lanzara. Smith received a card informing him that the City's "Action Center" had received his request to install stop signs in *the Meadows West area,* that the request had been forwarded to the Transportation and Public Works Department, and that the Action Center would receive a response from that department by December 19, 1985.

The Transportation and Public Works Department's response, signed and dated by Cooper on December 15, 1985, stated that:

Stop signs will be installed on all the streets that intersect Bellaire Dr. South & at the intersections of River View Rd. with Meadow Haven Dr. & with River Bend Rd. Speed limit signs will also be installed on Bellaire Dr. South. At this time the parking on Bellaire Dr. south of the I–20 overpass is due to a lack of adequate parking for construction workers. Since Bellaire Dr. South is 48 feet wide, and this is a temporary condition, it is not necessary to restrict parking at this time. Should parking persist after construction in this area is complete, parking will be restricted.

On December 13, 1985, Cooper signed work orders to install 35 mile-per-hour signs on Bellaire Drive South at or near Meadows West Drive, Blue Meadow Drive and Morning Dew Drive. On that same date, he also signed work orders to install stop signs at the following streets intersecting Bellaire Drive South: Meadows West Drive, Watermill Drive, Blue Meadow Drive, Morning Dew Drive, Cool Meadow Drive, Meadow Haven Drive, Riverdale Drive, Deep Valley Lane, and Ashbrook. Each of the work orders contained the notation that the action had been requested by "Whit Smith" or "Whit Smith/Meadows West H.O. Assoc." Each of the streets named above was located in the Meadows West Subdivision.

Cooper testified that although the three streets intersecting Bellaire Drive South in the Bellaire Park North subdivision, Trinity Landing, Glen Meadow Drive and Savannah Lane, had been platted by mid-December, 1985, they had not been built by that time and that in December, 1985, an order to install stop signs at all streets intersecting Bellaire Drive South could not have applied to the Glen Meadow Drive and the other two Bellaire Park North subdivision streets intersecting Bellaire Drive South because those streets had not yet been built and opened to the public.

On March 26, 1986, the City conducted a final inspection of the Bellaire Park North Subdivision and on April 15, 1986, the City

informed the developer of that subdivision that the work met with City specifications and that the City accepted the area for maintenance. Cooper testified that the streets in the Bellaire Park North Subdivision, including Glen Meadow Drive, had to have been built by the date of the final inspection.

A memo from the City's Action Center dated June 4, 1986, requested that Cooper inspect the intersection of Meadows West Drive South and Bellaire Drive South, in the Meadows West Subdivision, for the installation of four-way stop signs. The memo indicated citizens wanted the stop signs in order to slow traffic on Bellaire Drive South. At the time the request was made, stop signs were located only on Meadows West Drive at the intersection with Bellaire Drive South. The memo stated the request for the stop signs came from Smith and the *Meadows West Neighborhood Association,* and said neighbors felt that traffic was moving too quickly because it did not have to stop on Bellaire Drive South. Cooper's response, dated June 4, 1986, stated:

> Meadows West Drive So. is a local residential street. Bellaire Drive South is a minor thoroughfare designed to serve the purpose of carrying thru traffic and should not be required to stop in conjunction with or in lieu of an intersecting residential street. When this area is fully developed, it is anticipated that Bellaire Drive South will carry 20–24,000 vehicles daily. Children should be discouraged from playing in and around public streets, especially thoroughfares. The existing stop control on Meadows West Drive So. is appropriate for this intersection.

On January 5, 1987, Smith reiterated his concern about traffic along Bellaire Drive South near Meadows West Drive South in a letter to Cooper thanking the City for the installation of a stop light at Bryant Irvin and West Vickery Boulevard. Smith referred to the June, 1986 decision by Cooper that a four-way stop at Bellaire Drive South and Meadows West Drive was not feasible and instead requested a "Slow" or "Caution Watch for Children" sign to reduce the speeds of drivers along Bellaire Drive South. On the letter from Smith to Cooper were the handwritten notations "Answered by phone" and "Please draft nice response, Walt." Minutes from the Meadows West Homeowners Association board meeting on February 11, 1987 indicated that by the time of the meeting there had not yet been a response to Smith's January, 1987 request.

On May 13, 1987, City Councilman Bill Garrison contacted Gary Santerre, the City's Director of the Transportation and Public Works Department, about traffic on Bryant Irvin Road near Interstate 20 and *"through Meadows West and beyond."* Garrison wrote Santerre the residents claimed they were told the traffic count did not warrant stop signs to break the speed, and Garrison asked for suggestions.

Santerre responded in writing to Garrison's request on May 21, 1987 and said:

> Your letter which expressed concern about speeding traffic occurring on Bryant–Irvin Road South through Meadows West was, I think, intended to reflect a problem recently expressed by the *Meadows West Community* on Bellaire Drive South. [Emphasis added.]

The letter paraphrased Cooper's June, 1986 response to the "Action Center" memo indicating that Bellaire Drive South was constructed to carry up to 24,000 cars daily. Santerre's letter also stated that:

> As a result, this facility should not be required to stop in conjunction with or in lieu of an intersecting residential street. Unnecessarily stopping thoroughfares creates even more undesirable conditions in neighborhoods by encouraging the diversion of through traffic onto residential streets not designed to carry such volumes.

The letter concluded with the comment that the police would be notified about the speeding problem "on Bellaire Drive South *adjacent to the Meadows West Addition."*

Sometime prior to a May 31, 1988, meeting of the Meadows West Homeowners Association, Cooper contacted Garrison regarding the continuing neighborhood concerns about speeds along Bellaire Drive South through Meadows West. Cooper stated in his letter he was enclosing a copy of the May 21, 1987,

letter about traffic along Bellaire Drive South and told Garrison he would be attending the May 31, 1988 homeowners association meeting.

Minutes from the May 31, 1988 Meadows West Homeowners Association meeting stated Cooper attended and discussed the request for a four-way stop at the intersection of Bellaire Drive South and Meadows West Drive, an intersection located in Meadows West. The minutes reflect Cooper said the traffic flow on Bellaire Drive South was not heavy enough for the City to take it upon itself to paint lane markings and indicated he would need a request from the homeowners association to do so. Cooper was also said to have promised to install another 35 mile-per-hour speed limit sign on Bellaire Drive South at Savannah Lane, located one block south of Glen Meadows Drive in the Bellaire North Subdivision.

Smith testified that in June, 1988, petitions were carried through the various streets of Meadows West and signed by residents requesting a four-way stop at the intersection of Bellaire Drive South and Meadows West Drive, a request which had been denied by Cooper in June, 1986. In addition to requesting the four-way stop, the petition stated:

> We believe that this section of Bellaire Drive South should not be considered a major thoroughfare. This section of Bellaire Drive South intersects Bryant Irvin at a point roughly across from the Country Day School and bows around, traveling through apartment complexes and residential areas. It then intersects Bryant Irvin again. We believe this should not be considered a major thoroughfare since the majority of people using this road would be residents of the apartments and homes along this corridor. Anyone else wishing to travel south would remain on Bryant Irvin (this would be much faster than cutting through on Bellaire Drive South).

The petition was signed by residents of the Meadows West subdivision, including Bill and Nena Miller. The City points out that none of the people who signed the petition listed an address which was in the Bellaire Park North Subdivision and that all of those who

signed listed addresses within the Meadows West Subdivision. This assertion is unrefuted by the Millers.

Cooper signed work orders to install the 35 mile-per-hour speed limit sign at Bellaire Drive South just south of Savannah Lane on June 6, 1988, and the sign was installed on June 8, 1988, one day before the fatal collision. On June 13, 1988, four days after the accident, Cooper signed work orders to install stop signs at the Bellaire Park North subdivision streets intersecting Bellaire Drive South, including Glen Meadow Drive.

The City contends the December, 1985, order to install stop signs clearly restricted its scope to the *Meadows West Drive* area, as evidenced by the fact that Smith's November 26, 1985, letter to Libby Lanzara said "Our Board of Directors is very interested in pursuing the placement of traffic signs *within Meadows West.*" Smith also testified that he wanted to see stop signs installed *in his neighborhood.* The City says the June, 1988 petition shows the two subdivisions were not synonymous and that all requests pertained to the *Meadows West Subdivision,* not the *Bellaire Park North Subdivision.*

The Millers argue the City was put on notice of the dangerous condition at the intersection of Bellaire Drive South and Glen Meadow Drive because the June, 1988 petitions asking for a four-way stop at Bellaire Drive South and Meadows West Drive also expressed larger concerns about a longer section of Bellaire Drive South. Appellants presented evidence the *Bellaire Park North* streets, including Glen Meadow, had been platted and approved by September 1985 and argue they should have been included in the December 1985 plans to install stop signs at "all streets intersecting with Bellaire Drive South."

The Millers also offered the testimony of David Steitel, a former San Antonio City Traffic Engineer and Assistant Director of Public Works. Steitel testified that the City's traffic engineer had a duty to see that traffic control devices are installed before streets are open to public use once it has been determined that a subdivision has been built in accordance with thoroughfare plan

requirements. Steitel also testified that he would have expected the December, 1985 work order to install stop signs at all streets intersecting Bellaire Drive South in the *Meadows West* subdivision to apply to three additional streets in the general vicinity, including Glen Meadow, because as "streets are added ... the same decision just moves along with it." Steitel testified that it was clear to him Glen Meadow was intended to be included in the installation of stop signs and "apparently, somehow fell through the crack."

Finally, the Millers also introduced a document, handwritten by Cooper, listing Glen Meadow as one of the streets intersecting Bellaire Drive South in the *Meadows West* subdivision area. The Millers assert this indicates that Glen Meadow was or should have been included in the original decision to place stop signs along Bellaire Drive South, but Cooper testified that he could not remember when the note was written and that it might have been prepared in response to a Request for Production once litigation began after the accident.

The Millers rely on the following to demonstrate that the City had notice of the need for a stop sign at the intersection of Bellaire Drive South at Glen Meadow Drive: the City's approval of the amended plat of *Bellaire Park North* in September, 1985, which showed that Glen Meadow Drive would intersect with Bellaire Drive South; testimony that the City Traffic Engineer's Office regulates traffic on streets the city has approved and coordinates the transition of streets from the developer to the City; the November 26, 1985 letter from Smith asking for stop signs at all streets that intersect Bellaire Drive South; testimony that the City Traffic Engineer has a duty to evaluate new streets and intersections for hazards; and Cooper's December 15, 1985, response to the Action Center request stating that "stop signs will be installed on all the streets that intersect Bellaire Dr. South."

It is clear that the residents of the *Meadows West Subdivision* had longstanding concerns about traffic along Bellaire Drive South in their neighborhood. There is no record, however, of any communication from a *Bellaire Park North* homeowners group about the roads intersecting Bellaire Drive South in their neighborhood, including Glen Meadow, nor is there any record of communication from the *Meadows West* residents to the City about the need for stop signs at the three streets crossing Bellaire Drive South in the *Bellaire Park North Subdivision*. There is also no evidence that, when the residents of *Meadows West* contacted the City about traffic concerns *in their neighborhood,* they commonly considered their neighborhood to include that portion of the *Bellaire Park North Subdivision* where Bellaire Drive South intersected Glen Meadow Drive. Indeed, the testimony from Whit Smith that he didn't know what became of plans to invite *Bellaire Park North* homeowners into the *Meadows West Homeowners Association* leads us to believe the idea was never actively pursued.

We do not find the November 26, 1985, letter from Whit Smith to Libby Lanzara, later forwarded to Walt Cooper, asking for stop signs along the streets *in Meadows West* which intersected with Bellaire Drive South gave the City notice that a sign or signal was needed at Glen Meadow Drive and Bellaire Drive South, particularly since the streets in the *Bellaire Park North Subdivision* which intersect Bellaire Drive South, including Glen Meadow Drive, had not even been constructed by November 26, 1985. Nor do we read Walt Cooper's December, 1985, response to the Action Center, regarding the placing of stop signs at all streets intersecting Bellaire Drive South as including Glen Meadow Drive, which had not been constructed by that time.

Additionally, we cannot say the 1988 petition, signed by residents of *Meadows West,* including the Millers, supports the Millers' contention that the City had notice the intersection of Bellaire Drive South and Glen Meadow Drive was dangerous and needed a stop sign. The petition specifically asked that a four-way stop be installed at the intersection of Bellaire Drive South and *Meadows West Drive.* Although the neighbors may have expressed their concerns about the amount and speed of traffic using Bellaire Drive South generally, the petition did not

ask that the stop signs be included at *all* cross streets intersecting Bellaire Drive South in *both* subdivisions.

Although Walt Cooper testified at trial that he had been in the vicinity of the intersection of Bellaire Drive South and Glen Meadow Drive one week before the fatal collision and that he had added speed limit signs along Bellaire Drive South near Trinity Landing (one block north of Glen Meadow Drive and, like Glen Meadow Drive, also located in the *Bellaire Park North Subdivision* ) only days before the accident, Cooper also testified that "There was never a discussion with regard to putting stop signs on the cross streets, or the need for that" and that he was not aware of the need for stop signs at Glen Meadow Drive, Trinity. Landing or Savannah Lane in the *Bellaire Park North Subdivision.*

It appears clear that the City had notice of the need for stop signs at the streets intersecting Bellaire Drive South in the *Meadows West Subdivision* and responded to those requests; however, we conclude that the evidence, including evidence of the concerns expressed by the residents of the *Meadows West Subdivision* regarding the need for stop signs in that subdivision, did not give the City notice of a problem regarding a general need for stop signs in the *Bellaire Park North Subdivision,* or a particular need for a stop sign at the intersection where the accident occurred. Thus, there is no evidence showing the City had notice of a dangerous condition which may have existed at that intersection due to the lack of a stop sign. Having received no such notice, the Millers' claims against the City under the TCA are barred by the governmental immunity which was preserved under the provisions of section 101.060.

The Millers argue to the extent, if any, that jury findings of notice to the City and failure of the City to correct the absence of a stop sign are necessary to support the Millers' recovery, those findings are presumed in support of the verdict. They point out that the City did not object to the omission of any questions or instructions in the court's charge regarding notice and failure to act within a reasonable time, and they cite *Harmes v. Arklatex Corp.,* 615 S.W.2d 177 (Tex.1981). However, rule 279 of the Texas Rules of Civil Procedure states that the omitted elements "shall be deemed found by the court in such manner as to support the judgment," if there is "factually sufficient evidence to support a finding thereon." TEX. R.CIV.P. 279. As we have discussed, the evidence was not factually sufficient to find the City had notice. We sustain the City's first cross-point, and having done so we need not address its other cross-points.

The judgment of the trial court is reversed and judgment is here rendered that the Millers take nothing under their claims against the City.